**CONTINENTAL CASUALTY COMPANY, an Illinois Corp., in its own right and as Subrogee of Edward C. Levy Company, a Michigan Corp., Plaintiffs,**

**v.**

**GREAT AMERICAN INSURANCE COMPANY, an Ohio Corp., Defendant.**

No. 86 C 3938.

United States District Court, N.D. Illinois, E.D.

April 27, 1989.

William V. Johnson and Matthew J. Morrissey, Johnson, Cusack & Bell, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Continental Casualty Company ("CCC") and Great American Insurance Company have filed peculiar cross-motions for summary judgment.[1] For the reasons stated below, this court grants each party summary judgment on some of the issues raised in CCC's First Amended Complaint (hereinafter "Complaint"), but not others.

The undisputed facts are as follows.[2] CCC is an Illinois-based insurance company. It was an insurer of Edward C. Levy Company, a Michigan corporation, under an excess umbrella liability policy. Underneath CCC's policy were two policies of Great American, an Ohio-based insurer. Great American's policies had limits of $1 million per person for bodily injury liability, $1 million per person for contractual bodily injury liability, and $100,000 per person for employer's liability.

The genesis of the present dispute is an accident that occurred on February 22, 1969. Levy had a contract with Ford Motor Company to remove slag and other debris from a Ford mill operation in Dearborn, Michigan. Since the debris was valuable, Levy used a truck scale to weigh it before hauling it away from the plant. While using the scale on February 22, a Levy employee, Frederick Denlar, fell from

John Kuha, Brinton & Bollinger, Chicago, Ill., for plaintiffs.

1. The parties' failure to comply with the Local Rules on both motions has only added to the peculiarity. Local Rule 12(e) at the time these motions were filed required moving parties to do the following:

> With each motion for summary judgment pursuant to Rule 56 of the Federal rules of Civil Procedure the moving party *shall* serve and file ... a statement of the material facts as to which the moving party contends there *is no genuine issue and that entitle the moving party to judgment as a matter of law,* including with that statement references to the affidavits, parts of the record and other supporting materials relied upon to support such statement. *Failure to submit such a*

> statement constitutes grounds for denial of the motion.

(Emphasis added). Opposing parties had their own duties under Local Rule 12(f):

> Each party opposing a Rule 56 motion *shall* serve and file ... a concise "statement of genuine issues" setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated....

(Emphasis added). Had the court recognized *the parties' failure to comply with the Local Rules* sooner, the court would have dismissed both of these motions summarily.

2. The court will address specific factual disputes as they arise.

it. The accident rendered Denlar a quadriplegic, and ultimately resulted in his death.

Denlar's estate sued Ford in 1974 for wrongful death, alleging that Ford and the Buffalo Scale Company were negligent and had breached warranties to Denlar. On January 5, 1976, Ford tendered its defense of this action to Levy, based on its belief that Levy was at fault for not having corrected dangerous and unsafe conditions at the truck scale. Ford may have thought that Levy would take the defense because of this provision in its contract with Levy:

> Levy agrees that it shall be responsible for any and all injuries to persons ... which occur as a result of the fault or negligence of Levy, its agents, servants, or employees, or the joint negligence of the agents, servants, or employees of Ford and Levy, in connection with the performance on Ford's premises of work contemplated by this Agreement, and that Levy shall save harmless and indemnify Ford from and against any liability for such injury or damage....

Ten days later Levy notified Great American of Ford's tender. Neither Levy nor Great American accepted it. Ford renewed its demand on March 31, 1976. It go no response. Later on November 15, 1978, Ford made yet another demand that Great American assume Ford's defense, negotiate a settlement, and satisfy any judgment owed to Denlar's estate. Ford also informed Great American that the attorney for Denlar's estate, Stanley Schwartz, had asked for $350,000, plus waiver of Great American's worker's compensation lien of $125,000, to settle Denlar's claim. Great American refused once again to defend Ford, and did not pursue Schwartz's offer.

The case of *Gage, As Administrator of the Estate of Frederick Denlar v. Ford Motor Company* proceeded to trial and resulted in a verdict in favor of Denlar's estate of $1.5 million. Ford appealed unsuccessfully, adding costs and interest to the judgment. See *Gage v. Ford Motor Co.*, 102 Mich.App. 310, 301 N.W.2d 517

(1980). Ford paid this sum to Denlar's estate, then sued Levy in Wayne County Circuit Court. Ford's suit sounded in four theories of liability: contractual indemnity, common-law indemnity, implied indemnity, and breach of warranty. On May 6, 1983 Judge Joseph B. Sullivan granted Ford summary judgment in the case of *Ford Motor Company v. Edward C. Levy Company* on all four theories of liability, finding that Levy had to indemnify Ford for $2,351,628.29 plus costs and interest.

Great American appealed on behalf of Levy to the Michigan Court of Appeals. That court affirmed the lower court's holding on the issue of contractual indemnity, but did not address the issues of common-law indemnity, implied indemnity, or breach of warranty. See *Ford Motor Company v. Edward C. Levy Company*, No. 71584 (Mich.App. July 23, 1985) (per curiam). The Michigan Supreme Court denied Levy's application for leave to appeal. Thereafter, pursuant to affidavits of written recognizance, Great American and CCC satisfied Levy's obligations to Ford, with Great American paying $1,644,638.05 and CCC paying $2,254,948.32.

CCC brought suit in this court on June 2, 1986 to recover all sums it had paid to Ford. CCC amended its complaint on July 11, 1986. In that complaint, CCC charges that Great American breached its duty of good faith towards CCC and its duty of good faith towards Levy, for whom CCC is a subrogee. CCC has set forth twelve acts in its complaint, one or more of which CCC alleges amounts to a breach of Great American's respective duties. Great American has moved for summary judgment as to some of these alleged acts, arguing that some of them never occurred or, even if they occurred, they do not amount to a breach of duty.[3]

*Great American's Motion For Summary Judgment*

■ The court will first treat Great American's arguments as to the facts raised in the Complaint. In the Complaint

---

**3.** As CCC has alleged that these acts (except for the twelfth) amounted to breaches of both duties put forth in Counts 1–2, any decision as to whether one act violates the duty set forth in Count 1 is also a decision as to the duty expressed in Count 2.

CCC alleges that Great American rejected the advice of its attorney to accept Ford's tender. This allegation stems from two letters written by Sanford N. Lakin, a Southfield, Michigan lawyer whom Great American consulted shortly after Ford tendered defense of the Denlar suit for the first time. Lakin's first letter, dated February 16, 1976, discusses three issues: whether the Michigan Statute of Limitations barred Denlar's claims, whether Levy was obliged to accept Ford's tender, and whether Great American had to defend Levy. Lakin answered "no" to the first question. As to the second, Lakin suggested that Denlar's complaint set forth a cause of action imputing negligence to Levy, which could result in liability for Levy by operation of its indemnity contract with Ford. Lakin withheld comment as to the last question, whether Great American had a duty to defend Levy, as he had not reviewed Levy's policy with Great American.

Lakin wrote his next letter to Great American on August 5, 1976. Lakin noted that he still had not received a copy of the Levy policies from Great American. Lakin wrote, however, that "there is no obligation of Levy to take over Ford's defense at this time." This was because Denlar had not stated a claim directly against Levy. Lakin conceded, however, that "eventually somewhere down the road I can forsee either a Third Party Action over, or a Declaratory Judgment for indemnification which can be brought by Ford." For this reason, Lakin assumed that his law firm eventually would be involved in the Denlar matter and take over Levy's defense. Lakin urged the company to make it clear to him on what basis his firm would assume the defense.

Contrary to CCC's allegations, Lakin never "advised" Great American to accept Ford's tender in either of these letters. At most, Lakin expressed speculations that Ford would sue Levy and that Great American might choose to defend Levy. Lakin, however, pointed out that a court would have to find negligence on the part of Levy before Levy's contract with Ford exposed Levy to liability, and that any obligation which Great American owed to Levy stemmed from whatever Great American provided in its policies with Levy—policies that Lakin had not seen when writing either of his letters. Since CCC has put forth no facts indicating that Lakin advised Great American any differently, this court will grant Great American summary judgment on the question of whether it ignored Lakin's advice to accept Ford's tender. See Rule 56(e), Fed.R.Civ.P. (adverse party must respond with "specific facts showing that there is a genuine issue for trial;" failure to respond shall result in summary judgment, if appropriate).

■ CCC next alleges in the Complaint that Great American "controlled" the litigation of and settlement discussions in the Denlar matter. Pressed by Great American's present motion, CCC has submitted no evidence that this was the case. In fact, CCC acknowledges elsewhere that Great American did not conduct the defense of Ford in Denlar's suit. As for settlement, Great American has submitted excerpts from a deposition of Stanley Schwartz, Denlar's attorney, where Schwartz states that Great American's sole power in settlement—its ability to waive its worker's compensation lien—was not instrumental. Rather, settlement foundered because Ford refused to meet Schwartz's demand of $350,000. CCC has not submitted any evidence of Great American's greater control over the settlement negotiations, and thus Great American is entitled to summary judgment on the issue.

Great American next attacks CCC's contention that it pressured CCC to sign an affidavit of written recognizance with respect to the judgment against Levy. Great American claims that Richard Hore, CCC's claims supervisor, states in his deposition that CCC freely signed the affidavit. Great American has submitted Hore's deposition, but fails to indicate where in its sixty-five pages Hore makes this statement. Great American further asserts that "the record will show" that the law required CCC to sign the affidavit, and that CCC did not raise the issue of Great American's bad faith until it had to "make good" on its excess coverage in favor of Levy.

■ This court will not grant summary judgment on the basis of assertions like these. What Great American attempts to do here is similar to what occurred in *Friedel v. City of Madison*, 832 F.2d 965 (7th Cir.1987), where three police cadets sued the City of Madison, the head of the police division which supervised the City's police academy, and the City's insurer for discrimination on the basis of race and sex. The defendants moved for summary judgment, and submitted affidavits. It then became incumbent upon the cadets, under Rule 56(e) and local rules which are similar to those of this district, to set forth specific facts demonstrating that there was a genuine issue for trial. Instead, the cadets proposed "findings of fact" in opposition to the defendants' statement of undisputed facts, and failed to cite portions of the record which supported their assertions to the court.

The district court granted summary judgment to the defendants, in part because of the cadets' inadequate response to the defendants' statement of uncontested facts. The Seventh Circuit affirmed this decision, noting Rule 56(e)'s command that the party opposing summary judgment must respond by setting "forth specific facts showing that there is a genuine issue for trial." The court noted several other deficiencies in the cadets' opposition to the motion, including their failure to submit admissible and competent evidence. See *id.* at 968–71.

*Friedel* differs in two respects from this case. First, the *Friedel* plaintiffs submitted evidence which was largely inadmissible. Second, the posture of these cases differs. In *Friedel*, the plaintiffs opposed a motion for summary judgment, while here Great American proposes the motion.[4] Nevertheless, the court may not grant summary judgment unless the movant establishes that he or she is entitled to it, both as a matter of law and of fact. See Rule 56(c). This court cannot conclude on the basis of cursory allusions to "the record" or references to an entire deposition that certain facts could exist, much less look undisputed. For this reason, the court finds that Great American has not shown that it is entitled to summary judgment on the issue of whether CCC signed an affidavit of written recognizance willingly.

■ The court now turns to Great American's contentions that some of the acts alleged in the Complaint are insufficient to establish Great American's fault. Under Michigan law,[5] "bad faith" in the insurance setting is arbitrary, reckless, indifferent or intentional disregard of a person owed a duty. As the court in *Commercial Union Ins. Co. v. Liberty Mut. Ins.*, 426 Mich. 127, 135, 393 N.W.2d 161, 164 (1986), put it, an insurer's bad faith is a "state of mind," a reflection of its selfish purposes or its "desire to protect its own interests at the expense of the insured's...." The *Commercial Union* court went on to list twelve "factors" which a trier of fact can consider in deciding whether bad faith exists. The court noted that its list was not exclusive, and that no single factor was decisive. See *id.* 393 N.W.2d at 165–66.

■ Great American asks this court to weigh several of the acts alleged in the Complaint against what it sees as *Commercial Union's* standard of liability. The company contends first that it could not have acted in bad faith towards Levy and CCC in failing to inform them of Schwartz's settlement demand. Great American points out that Denlar's suit was against Ford, not Levy, and since Great American had no obligation to settle on behalf of Ford, it had no duty to inform Levy of Schwartz's demand to Ford. As

---

**4.** One could argue that those opposing a summary judgment motion have a greater obligation to be specific, as the Rules require opponents to do so. See Rule 56(e).

**5.** While neither party claims expressly that Michigan law controls this dispute, they have relied chiefly on Michigan cases, and the principal events in this dispute took place in Michigan.

Where a cause of action is reasonably related to a particular state and the parties imply that they wish to be bound by the laws of that state, the court will respect the parties' choice. See *City of Clinton, Ill. v. Moffitt*, 812 F.2d 341, 342 (7th Cir.1987) (parties can stipulate to applicable substantive law, within broad limits).

for CCC, Great American argues that it had no duty to inform CCC of Schwartz's demand as long as it fell within the limits of Great American's contractual bodily injury endorsement.

The problem with Great American's arguments on these scores is that, as *Commercial Union* instructs, bad faith is a question of motives, and motives are questions of fact. CCC has offered evidence that Great American was aware of the strong likelihood that Ford would seek indemnification from Levy. Such indemnification certainly could have affected Levy's interests. CCC also has submitted evidence that suggests that Great American was aware of the possibility that a verdict in the Denlar suit could exceed its policy limits, which surely would have affected Levy and CCC's interests. Whether Great American's disregard of these probabilities and its subsequent failure to notify Levy and CCC of Schwartz's offer amount to bad faith is for the jury to decide. See *id.* at 165 (decision as to whether acts amount to bad faith is the factfinder's).

■ Great American next attacks CCC's suggestion that its refusal to waive its worker's compensation lien, as Schwartz had demanded, amounted to bad faith. Great American also assails CCC's claim that its refusal to waive the lien derailed a settlement with Schwartz. Great American's arguments have some force. As noted above, Schwartz testified in a deposition that even if Great American had waived its lien, settlement still would have been unlikely. Nevertheless, Great American will not receive summary judgment on the issue of whether its refusal to waive its lien amounted to bad faith. As the *Commercial Union* court noted, a jury can find that a party has acted in bad faith even if the action itself was not harmful.

CCC contends that Great American's "dogged" efforts to recover on its lien indicate a preference of its interest over Levy's —something which is impermissible under Michigan law. See *Harrison v. Ford Motor Company*, 370 Mich. 683, 122 N.W.2d 680 (1963) (holder of worker's compensation lien may not seek to recover on lien from a party whom the lienholder insures). Great American suggests that there was no violation akin to that in *Harrison* in this case, as it sought to recover on its worker's compensation lien from Ford, not Levy. If Great American was aware of the strong possibility that Ford would seek to recover from Levy, or was aware of the possibility that Denlar could receive a verdict in excess of Great American's policy limits, a jury could reasonably infer from Great American's effort to recover on its lien that it was acting in bad faith toward Levy and/or CCC. To this extent, the actual effect of Great American's refusal to settle, while relevant as to whether Great American acted in good faith, does not decide the issue.

Great American's request for summary judgment on the issues of whether it acted in bad faith in failing to defend Ford in the Denlar suit, refusing to settle the suit, or not entering into settlement discussions exhibits the same misapprehension of *Commercial Union* as the arguments made above. It is true that Great American was not contractually obliged to defend Ford, discuss settlement with persons suing Ford, or settle cases involving Ford. Great American also was not contractually obliged to defend Levy. On the other hand, given Great American's obligations to insure Levy, Levy's indemnity agreement with Ford, the circumstances surrounding the Denlar matter, and particularly Great American's estimate of the risks of liability in that suit, at some point Great American may have had a good faith duty to enter the fray and prevent things from resulting in a large verdict.

Both Lakin and one of Great American's assistant vice presidents, John Bickley, were aware of the possibilities of being dragged into the Denlar suit. Joseph Aubin, a former claims manager for Great American, stated in his deposition that Great American sometimes chose to involve itself in a defense and settlement even where contractual duties were absent; whether the company's actions in the Denlar matter represent a bad faith departure

from Great American or industry custom is something for the jury to decide.

*CCC's Amended Motion for Summary Judgment*

In contrast to Great American's motion, CCC's motion seeks resolution of legal issues, not factual ones. CCC concedes that even if it prevailed on these issues, there would remain genuine issues of material fact preventing it from receiving summary judgment on its entire Complaint. Recognizing this, the court will turn to CCC's motion.

■■■ CCC first contends that Great American wrongfully denied coverage under its employer's liability policy when Levy had to indemnify Ford. Great American concedes that, had Levy's sole coverage been its employer's liability policy with Great American, Great American would have had to pay Ford pursuant to this policy. Great American contends that it discharged its obligation to Levy and Ford, however, by tendering the highest of its policy limits applicable to the indemnity action, that of $1 million for contractual bodily injury liability. CCC responds that Great American was obliged to tender both policy limits.

Under Michigan law, an insured can recover under separate endorsements or policies if he or she has paid separate premiums for each endorsement or policy. See *Bradley v. Mid–Century Ins. Co.*, 409 Mich. 1, 294 N.W.2d 141 (1980); *Allstate Ins. Co. v. Riverside Ins. Co. of America*, 509 F.Supp. 43 (E.D.Mich.1981); *Detroit Auto. Inter–Ins. Exchange v. Joseph*, 67 Mich.App. 393, 241 N.W.2d 221 (1976). Persons are free, of course, to promise not to seek multiple recoveries or "stack" coverages. See *Bradley*, 294 N.W.2d at 157 (automobile policy's "other insurance" clause enforceable, absent conflict with Michigan statutes; clause worked to prevent stacking of separate policies issued to single insured); *Detroit Auto. Inter–Ins. Exchange v. Gavin*, 416 Mich. 407, 418, 331 N.W.2d 418, 424 (1982) ("other insurance" clauses enforceable, and can prevent stacking); *Auto Club Ins. Ass'n v. Hill*, 431 Mich. 449, 459, 430 N.W.2d 636, 640 (1988) (same holding).

Great American does not dispute that Levy paid separate premiums for its contractual bodily injury liability and employer's liability coverages. In fact, its coverages were contained in separately numbered policies. Nevertheless, Levy effectively contracted to recover only on the higher of these two limits, as the policy which contains the contractual bodily injury liability endorsement contains an "other insurance" clause:

> If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss....

If Great American had tendered its limit under its employer's liability policy, there would have been a dollar-for-dollar reduction in its tender under the contractual bodily injury liability endorsement of its general liability policy. CCC thus cannot complain that Great American did not tender its employer's liability limit.

■■ CCC's next assertion is that, properly construed, the coverage limit of Great American's general liability policy is $2 million, not $1 million. As noted earlier, Great American covered Levy's bodily injury liabilities up to $1 million per occurrence (under its "Coverage A") and contractual bodily injury liabilities up to $1 million (under its "Coverage Y"). Great American tendered its limit under Coverage Y, but not Coverage A. CCC contends that Great American should have tendered both.

CCC directs the court to Exclusion (g) of Great American's general liability policy. That exclusion states that the policy does not apply

> under Coverage A, except with respect to liability assumed by [Levy] under a contract as defined herein, to bodily injury to or sickness, disease, or death of any employee of [Levy] arising out of and in

the course of his employment by [Levy]....

In industry parlance this clause once was known as the "employer's liability exclusion." Such exclusions forced companies such as Levy to seek separate coverage for employer's liability. The clause was ambiguous, however, as to whether it covered an obligation of the insured to indemnify another for injuries to which the exclusion would otherwise apply. Recognizing this ambiguity, companies such as Great American amended the clause to exclude coverage of indemnification contracts specifically.

CCC asks this court to hold that the Michigan courts would follow the lead of the courts of five other states in determining that, prior to the amendment of the standard employer's liability exclusion, endorsements such as Great American's Coverage A applied to contracts to indemnify another for employment injury liabilities. See *Home Ins. Co. v. Southport Terminals, Inc.*, 240 So.2d 525 (Fla.App.1970) (employer's liability exclusion does not apply to stevedore's action under admiralty law against shipowner for indemnification; underlying liabilities stemmed from workplace injuries to stevedore's employees); *U.S. Fidelity & Guar. v. Globe Indem.*, 60 Ill.2d 295, 327 N.E.2d 321 (1975) (exclusion does not apply to employee's action against employer named additional insured by operation of contract between insured and employer); *Zenti v. Home Ins. Co.*, 262 N.W. 2d 588 (Iowa 1978) (same); *Royal Globe Ins. Co. v. Poirier*, 120 N.H. 422, 415 A.2d 882 (1980) (exclusion does not apply to insured's obligation to indemnify contractor for employment-related injuries); *Ins. Co. of North America v. Dayton Tool & Die Works, Inc.*, 57 N.Y.2d 489, 457 N.Y.S.2d 209, 443 N.E.2d 457 (1982) (exclusion does not apply to action for contribution resulting from workplace liabilities). CCC asserts that the Michigan courts would adopt the view of these courts since Michigan shares their law on the scope of exclusions in insurance contracts, see, for example, *Century Indemnity Co. v. Schmick*, 351 Mich. 622, 88 N.W.2d 622 (1958) (insurer must draft exclusions to make scope of its

non-liability clear); *Detroit Automobile Inter–Insurance Exch. v. Bishop*, 24 Mich. App. 90, 180 N.W.2d 35 (1970) (same holding), and the proper way to construe ambiguous exclusions, see, for example, *McNally v. American States Insurance Company*, 308 F.2d 438, 445 (6th Cir.1962) (applying Michigan law—exclusions that are of uncertain applicability construed against insurer).

Great American chooses not to contest CCC's argument as to how the Michigan courts would construe the employer's liability exclusion in Great American's general liability policy with Levy. After all, how the Michigan courts would construe the exclusion does not determine whether Great American is liable to CCC in this suit: the issue here is whether Great American has acted arbitrarily, recklessly, indifferently or intentionally in disregarding a duty to tender to Levy its limit under Coverage A. This court's view of how the Michigan courts would construe the exclusion is pertinent to the ultimate issue, but it does not decide it.

All of this understood, this court holds that the Michigan courts would construe the employer's liability exclusion contained in Levy's policy with Great American so as not to exclude coverage of liabilities resulting from indemnification contracts—even if the liability being indemnified stemmed from an employment-related accident. What CCC gets as a result of this ruling is not clear—perhaps it only prevents Great American from arguing to a jury that there was no argument for liability under Coverage A. Nevertheless, CCC has asked for this ruling; Great American has raised no arguments as to why this court should not grant CCC's request, and so the court will so rule.

CCC argues further that, given that Coverages A and Y applied to Ford's demand for indemnity, Levy should have received the benefit of both coverages. As noted above, under Michigan law the general rule is that an insured can recover under separate endorsements which carry separate premiums, unless the parties agree otherwise. Great American has not directed this court to any provision in its policy suggest-

ing that Levy could not have recovered under both coverages. Again, Great American seems to rest on a position that even if a court could hold it liable under both coverages, its denials of coverage were not in bad faith. The court will not disturb Great American's choice of tactics, but by the same token this court will rule when a party so requests. This court thus holds that Levy was entitled to receive the benefit of Coverages A and Y.

■ CCC's last contention is that Great American is liable for all of the interest accrued after the date of the Denlar verdict, and not just a pro rata share of the interest accrued since the judgment against Levy. CCC's argument rests on two propositions: first, that Great American contracted to assume all post-judgment interest, and second, that the pertinent judgment is that rendered in the Denlar suit, not the indemnity action against Levy.

Great American's obligation to Levy for interest stems from the following clause in Great American's general liability policy:

With respect to such insurance as afforded by this policy, [Great American] shall:

\* \* \* \* \* \*

(b)(2) pay all expenses incurred by [Great American], all costs taxed against [Levy] in any [suit against Levy alleging injuries covered by the policy] and all interest accruing after entry of judgment until [Great American] has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of [Great American's] liability thereon....

CCC argues that the plain language of this clause makes Great American liable for all post-judgment interest—after all, it says that Great American shall pay *"all* interest accruing after entry of judgment" until Great American tenders its policy limits. CCC cites the Michigan Supreme Court's decision in *Matich v. Modern Research Corp.,* 430 Mich. 1, 420 N.W.2d 67 (1988), where the court interpreted a clause that stated that an insurer shall pay "all interest on the entire amount of any judgment therein which accrues after entry of the judgment" and before tender of the insurer's policy limits to mean that an insurer

was liable for all interest on the judgment, and not merely the interest related to that part of the judgment for which the insurer was liable.

Again, Great American does not vigorously dispute CCC's preferred interpretation of Great American's policy. There may be strategic reasons for this—after all, the ultimate issue in this case is not whether Great American was liable for all post-judgment interest, but whether the company acted in bad faith in refusing to pay the interest. Great American's silence could indicate agreement with CCC's interpretation, too. Great American's interest clause is not as specific as the clause at issue in *Matich,* but the word "all" in Great American's policy stands unmodified, and is unambiguous. Even if it were ambiguous, this court would have to construe it against Great American, the author of the clause, and find liability for all post-judgment interest accordingly. See *Matich,* 430 Mich. at 24–25, 420 N.W.2d at 77–78, quoting *Highway Casualty Co. v. Johnston,* 104 So.2d 734, 736 (Fla.1958) ("Had [the insurer] entertained any doubt with reference to its obligation [under the standard interest clause] it could have revised the verbiage of its contract before the issuance thereof. The dilemma in which the carrier finds itself appears to us to be of its own making.") (bracketed portion in *Matich* ).

Great American suggests that if it is liable for all post-judgment interest, it will obtain pro-ration anyway. This is because, according to Great American, CCC's policy incorporated Great American's policy, which makes CCC equally liable for all post-judgment interest. Great American seems to imply further that given this dual responsibility for post-judgment interest, the best way to divide the responsibility is according to each insurer's liability for the underlying judgment.

Great American never directs the court to the clause in CCC's policy which allegedly incorporates Great American's terms. The court has found one clause, however, which reads as follows:

COVERAGE A—EXCESS LIABILITY INDEMNITY

[Continental] will indemnify [Levy] for loss in excess of the total applicable lim-

its of liability of underlying insurance stated in the schedule. The provisions of the immediate underlying policy are, with respect to Coverage A, incorporated as a part of this policy except for any obligation to investigate and defend and pay for costs and expenses incident to any of the same, the amounts of the limits of liability, an "other insurance" provision and any other provisions therein which are inconsistent with this policy.

This clause indeed results in CCC's incorporating Great American's obligation to Levy to pay post-judgment interest. CCC contends that post-judgment interest is excluded under the clause "except for any obligation to investigate and defend and pay for costs and expenses incident to any of the same." It cites to the decision in *Waldrop v. Rodery*, 34 Mich.App. 1, 3, 190 N.W.2d 691, 693 (1971), where the court described the purpose of granting a prevailing party interest and court costs as recompensing the party "for the delay in the payment of ... money damages determined and to put back in his pocket some of the expenses he incurs in instituting and prosecuting an action." That interest may be an "expense" of the prevailing party does not make it an expense for the losing party, however. As *Waldrop* suggests, the Michigan courts are unanimous that interest allowed under M.C.L.A. § 600.6013 (West 1987) is compensatory. See *Stewart v. Isbell*, 155 Mich.App. 65, 399 N.W.2d 440 (1986); *Osinski v. Yowell*, 135 Mich.App. 279, 354 N.W.2d 318 (1984); *Banish v. City of Hamtramck*, 9 Mich.App. 381, 157 N.W. 2d 445 (1968). By the very words of the statute, interest is not recoverable absent a money judgment or a settlement. By contrast, an expense or cost of litigation is incurred whether a party is found liable or not. Under Michigan law, this court must treat interest as an item of compensation, and not a mere cost or expense of investigation or defense.

CCC's incorporation of Great American's obligation to pay post-judgment interest does not end the matter. Great American calculated its share of the interest incorrectly. Great American derived its payment to Levy of $1,644,638.05 by adding (1) its one tendered limit of $1,000,000; (2) a pro rata share of interest accruing prior to the judgment in Ford's indemnity suit; and (3) a pro rata share of interest accruing after that judgment. Great American figured that its pro rata share in both (2) and (3) was 42.5%—its single limit of $1,000,000 divided by the Ford judgment of $2,351,-628.69. This figure is incorrect. Great American's pro rata share should have been $2,000,000 (Great American's double coverage) divided by $2,351,628.69, or 85%.

CCC would argue that Great American's share was *at least* 85%. In CCC's opinion, Great American should have calculated pro rata shares on the basis of the verdict in Denlar's suit, not the judgment in Ford's action against Levy. By this logic, Great American would be responsible for all of the interest in this case, as its $2 million combined coverage exceeded the Denlar verdict amount of $1.5 million.

The problem with CCC's argument is that, as noted earlier, no court adjudged Levy negligent until Ford sued Levy. That much is clear from the opinion of Judge Sullivan when he entered summary judgment. The court first noted, "It is my belief that what determines the result of this motion is not the scenario at the trial but the facts." The judge went on to cite several excerpts from a deposition of Edward C. Levy, Jr., who acknowledged that Levy Company had complete control over the Ford worksite. CCC Motion for Summary Judgment, Ex. 18. If the Denlar jury had found Levy liable at trial, Judge Sullivan never would have had to find as a matter of first impression that Levy was liable. CCC submits this was the result of fortuity: Denlar's Estate attempted to join Levy in its action, which would have allowed the Denlar jury to find Levy liable in that trial. The Denlar trial judge rebuffed this attempt. CCC cites no authority for the proposition, however, that parties "fortuitously" left out of a trial but later found liable should pay interest, and this court will not be the first to so hold. The assessment of interest under Michigan law is a statutory matter, and absent a statutory command, this court will not force a person who is not a party to a judgment to pay interest. See *Motyka v. Detroit, G.H. &*

*M. Ry. Co.,* 260 Mich. 396, 244 N.W. 897 (1932) (court may not expand duty to pay statutory interest beyond the limits of the statute).

Many of these observations are in the realm of "should have beens." As noted throughout this portion of this opinion, the real issue in this case is whether Great American acted in bad faith in denying its obligations. This is for the jury to decide. The court questions how useful these rulings are in bringing this matter any closer to resolution, and notes that it is the parties, and not the court, which requested them.

For the reasons stated in this opinion, this court grants Great American summary judgment on the issues raised in paragraphs 23(c), 23(h), 27(c), and 27(h) of CCC's First Amended Complaint, and the issue of whether its refusal to waive its worker's compensation lien blocked settlement of the Denlar suit. This court grants CCC summary judgment on the legal issues of whether Levy could have recovered under Great American's Coverage A in addition to Coverage Y, and whether Levy could have recovered a greater share of interest from Great American as a result. The motions for summary judgment on all other issues are denied.